CAROLINA POWER & LIGHT COMPANY, Petitioner v.
THE CITY OF ASHEVILLE, Respondent

No. COA02-1518

(Filed 4 November 2003)

**1. Cities and Towns— annexation—non-urban areas**

The trial court did not err case by concluding that respondent city's annexation of Non-Urban Areas 1 and 4 met the requirements of N.C.G.S. § 160A-48(d)(2), because: (1) N.C.G.S. § 160A-48(d)(2) does not require a non-urban area to touch the pre-annexation city limits of an annexing municipality; and (2) N.C.G.S. § 160A-48(d)(2) permits the annexation of non-urban areas completely enveloped by land developed for urban purposes.

**2. Cities and Towns— annexation—industrial use**

The trial court did not err in an annexation case by affirming respondent city's classification of the four tracts within PIN 1056 as industrial under N.C.G.S. § 160A-48(c)(3), because witnesses provided testimony that could support a finding that each tract was used in support of a power plant.

Judge Tyson dissenting.

Appeal by petitioner from judgment entered 18 February 2002 by Judge Zoro J. Guice, Jr. in Buncombe County Superior Court. Heard in the Court of Appeals 9 September 2003.

1

*Van Winkle, Buck, Wall, Starnes and Davis, P.A., by Larry McDevitt and Craig D. Justus, for petitioner-appellant.*

*Robert W. Oast, Jr. and William F. Slawter, for respondent-appellee.*

LEVINSON, Judge.

Petitioner appeals from a judgment affirming City of Asheville Annexation Ordinance No. 2708. We affirm.

I.

On 13 June 2000, the City of Asheville (hereinafter "City") adopted Ordinance No. 2708, "An Ordinance to Extend the Corporate Limits of the City of Asheville, North Carolina, Under the Authority Granted by Part 3, Article 4A, Chapter 160A of the General Statutes of North Carolina" (hereinafter "Annexation Ordinance"). This ordinance annexed into the City an area south of Asheville, which is referred to as the "Long Shoals Area." The City determined that this area qualified for annexation pursuant to N.C.G.S. § 160A-48(c)(3) and (d).

Appellant, Carolina Power & Light (CP&L), owns most of the Long Shoals Area, including land associated with its electricity generating facility and the power plant's man-made cooling pond (Lake Julian). CP&L contested the annexation in superior court pursuant to N.C.G.S. § 160A-50, and made two arguments at trial which are relevant to the present appeal.

CP&L's first argument dealt with two separate tracts referred to as "Non-Urban Area 1" and "Non-Urban Area 4." Non-Urban Areas 1 and 4 are adjacent along at least sixty percent of their external borders with land the City classified pursuant to G.S. § 160A-48(c)(3) as "developed for urban purposes." Neither Non-Urban Area 1 nor 4 is contiguous along its external boundary with the pre-annexation City limits. The City classified both properties as adjacent non-urban areas pursuant to G.S. § 160A-48(d)(2). At trial, CP&L argued that G.S. § 160A-48(d)(2) requires a non-urban area to share a border with both the municipal boundary and the boundary of an area developed for urban purposes. Because neither Non-Urban Area 1 nor 4 shares an external boundary with the pre-annexation City limits, CP&L insisted that classification as a non-urban area was inappropriate.

CP&L's second argument pertained to four tracts (Tracts 1-4) of land located within a larger tract. The larger tract is listed by the

CAROLINA POWER & LIGHT CO. v. CITY OF ASHEVILLE

[161 N.C. App. 1 (2003)]

Buncombe County Tax Office as PIN No. 9644.11-66-1056 (PIN 1056). The City classified more than five hundred acres of PIN 1056, including the four disputed tracts, as being in industrial use. At trial, CP&L contended that the City's classification of the four tracts was erroneous because those tracts are not used "in support of" CP&L's power generating facilities.

Following a bench trial, judgment was entered for the City. The trial court found, in pertinent part:

13. Five Non-Urban Areas were identified in the Long Shoals Area.

. . . .

15. The Plan as amended by the Annexation Ordinance reflects that each Non-Urban Area meets the 60% contiguity requirement [of G.S. § 160A-48(d)(2)]. . . .

16. As to Non-Urban Areas 1 and 4, CP&L does not dispute that the boundaries of those areas are adjacent or contiguous along 60% of their length with urbanized areas within the Long Shoals Area.

17. CP&L contends, and the Plan shows, that the external boundaries of Non-Urban Areas 1 and 4 are at no point contiguous with or adjacent to the existing City limits. CP&L further contends that the City incorrectly applied N.C.G.S. [§] 160A-48(d)(2) with respect to Non-Urban Areas 1 and 4 because the statute requires that the boundaries of Non-Urban Areas be contiguous with both the existing City limits and one or more urbanized areas within the annexation areas.

18. For reasons set out in the Conclusions of Law below, the Court has determined as a matter of law that CP&L's contentions on this issue are without merit, and that Non-Urban Areas 1 and 4 both satisfy the boundary contiguity requirement of N.C.G.S. [§] 160A-48(d)(2) because they are contiguous for more than 60% of their length with an area or areas developed for urban purposes.

19. In light of the foregoing, it is unnecessary for the Court to make any findings as to the issues raised by CP&L regarding the classifications and sizes of the lots and tracts within Non-Urban Areas 1 and 4. Nevertheless, the Court has considered the evidence presented as to Non-Urban Areas 1 and 4, and finds that:

CAROLINA POWER & LIGHT CO. v. CITY OF ASHEVILLE

[161 N.C. App. 1 (2003)]

(a)  Even though some use is made of one or more of the properties within those areas, the uses do not affect the overall character of the areas as not developed for urban purposes, and are not inconsistent with the designation of those areas as non-urban areas within the meaning of N.C.G.S. [§] 160A-48(d);

(b)  Non-Urban Areas 1 and 4 both lie between two or more areas within the Long Shoals Area that are developed for urban purposes;

(c)  Non-Urban Area 1 is completely surrounded by areas within the Long Shoals Area that are developed for urban purposes, with respect to which no issue has been raised;

(d)  Non-Urban Area 4 is surrounded on three sides by areas within the Long Shoals Area that are developed for urban purposes, with respect to which no issue has been raised.

. . . .

20.  CP&L owns several tracts of land within the Long Shoals Area, including [a] tract[] identified at the time of the adoption of the Annexation Ordinance by PIN[] . . . 9644.11-66-1056 . . . . [This] tract[] will be referred to herein by the last four digits of [its] PIN[].

21.  PIN 1056 is owned by CP&L, consists of 622.85 acres, and is the property upon which is located the Power Plant and most of Lake Julian. This property was classified [by the City] as being in industrial use, which CP&L does not dispute. 71.59 acres of this property was included as a portion of Non-Urban Area 1, including part of the dam and spillway for Lake Julian, and a power transmission line.

. . . .

23.  Within PIN 1056, CP&L identified 4 tracts of land (Tracts 1-4) that it contends are not used "in support of" its power-generating facilities. . . .

24.  . . . The sizes of the tracts . . . are set out below:

Tract 1—4.4 acres

Tract 2—14.34 acres

Tract 3— 9.96 acres

Tract 4—9.87 acres

. . . .

28. Tract 1 identified by CP&L within PIN 1056 is located on a peninsula jutting into Lake Julian. Tracts 2, 3, and 4 are on the periphery of areas in active use by the Power Plant. The accessibility of all of these tracts is limited. There was no evidence suggesting that the tracts, or any one of them, was suitable for use other than in support of the primary use of the property—the generation of electrical power.

. . . .

30. . . . The tracts are relatively small, isolated on the periphery of the combined CP&L property, and are essentially fragmentary remnants of the much larger Lake Julian/Power Plant facility.

31. The Court finds that these . . . tracts are used in support of the CP&L operation . . . . Even if the tracts are not in active use, they are so small as to be incidental to the primary use, such that the City is not required to consider that acreage as not being in use for commercial, industrial, governmental or institutional purposes, and therefore is not required to include that acreage in computing the degree of subdivision in the Long Shoals Area.

The trial court made the following conclusions of law:

4. With respect to the statutory qualifications in N.C.G.S. [§] 160A-48 for annexation for cities of over 5,000 population, the Court makes the following specific conclusions as to the issues raised at trial:

Non-Urban Areas 1 and 4

(b) Non-Urban Areas 1 and 4 are contiguous along 60% or more of their external boundaries with one or more areas within the Long Shoals Area that are developed for urban purposes within the meaning of N.C.G.S. 160A-48(c)(3);

. . . .

(d) There is no requirement in the law for the external boundaries of a non-urban area that meets the contiguity requirement of N.C.G.S. [§] 160A-48(d)(2) and acreage limitation of N.C.G.S. [§] 160A-48(d) to be contiguous with the boundary of the existing city.

(e) The inclusion of Non-Urban Areas 1 and 4 within the Long Shoals Area is consistent with the purpose of N.C.G.S.

[§] 160A-48 so as "to permit [the City] to extend [its] corporate limits to include all nearby areas developed for urban purposes and . . . to include areas not yet developed for urban purposes but constituting necessary land connections . . . between two or more areas developed for urban purposes. . . ."

. . . .

### CP&L Tracts

(i) As to the four tracts (Tracts 1-4) within PIN 1056 contended by CP&L to be undeveloped and not used in support of the industrial power plant use, the evidence does not support CP&L's contentions.

. . . .

(k) [T]he Court concludes that . . . the use classification[] assigned to PIN[] 1056, including the [four] tracts, [is] in fact correct. . . .

From the judgment affirming the annexation, CP&L appeals, contending: (1) the trial court erroneously affirmed the City's application of G.S. § 160A-48(d) to Non-Urban Areas 1 and 4, and (2) the trial court erroneously affirmed the City's classification of the four tracts within PIN 1056 as industrial pursuant to G.S. § 160A-48(c)(3). Moreover, CP&L argues that Non-Urban Areas 1 and 4 and the four disputed tracts within PIN 1056, when properly classified, must be added to the denominator of the subdivision test located in G.S. § 160A-48(c)(3). Because including this acreage in the subdivision test will allegedly disqualify the entire annexation, CP&L urges us to void the Annexation Ordinance.

### II.

The standard of review is as follows: "On appeal, the findings of fact made [by the trial court] are binding . . . if supported by the evidence, even though there [may] be evidence to the contrary. Conclusions of law drawn by the trial court from its findings of fact are reviewable *de novo* on appeal." *Food Town Stores, Inc. v. Salisbury*, 300 N.C. 21, 25-26, 265 S.E.2d 123, 126-27 (1980) (internal citations omitted). Statutory interpretation presents a question of law and is reviewed *de novo* by this Court. *Dare County Bd. of Educ. v. Sakaria*, 127 N.C. App. 585, 588, 492 S.E.2d 369, 371 (1997).

### III.

The present dispute involves several provisions of N.C.G.S. § 160A-48 (2001), which addresses the character of an area to be annexed. N.C.G.S. § 160A-48(a) (2001) provides:

A municipal governing board may extend the municipal corporate limits to include any area

(1) Which meets the general standards of subsection (b), and

(2) Every part of which meets the requirements of either subsection (c) or subsection (d).

N.C.G.S. § 160A-48(b) (2001) sets the following requirements:

The total area to be annexed must meet the following standards:

(1) It must be adjacent or contiguous to the municipality's boundaries at the time the annexation proceeding is begun. . . .

(2) At least one eighth of the aggregate external boundaries of the area must coincide with the municipal boundary. . . .

Pursuant to N.C.G.S. § 160A-48(c) (2001), an area must "be developed for urban purposes" as a precondition to annexation. An area developed for urban purposes is defined as any area which meets any one of the five standards enumerated in G.S. § 160A-48(c). The present case deals only with the third standard, which qualifies an area as "developed for urban purposes" where:

[The area is] so developed that at least sixty percent (60%) of the total number of lots and tracts in the area at the time of annexation are used for residential, commercial, industrial, institutional or governmental purposes, and is subdivided into lots and tracts such that at least sixty percent (60%) of the total acreage, not counting the acreage used at the time of annexation for commercial, industrial, governmental or institutional purposes, consists of lots and tracts three acres or less in size. . . .

The Supreme Court has held that subsection (c)(3) contains two mandatory tests for determining the availability for annexation:

(1) *the use test*—that not less than 60% of the lots and tracts in the area must be in actual use, other than for agriculture, and (2) *the subdivision test*—not less than 60% of the acreage which is in

residential use, if any, and is vacant must consist of lots and tracts of five [now three] acres or less in size.

*Lithium Corp. of America, Inc. v. Bessemer City*, 261 N.C. 532, 538, 135 S.E.2d 574, 578 (1964) (emphasis added). The subdivision test is at issue in the instant case; the use test is not.

Acreage in use for an industrial purpose is excluded from the subdivision test; a 1998 amendment to G.S. § 160A-48(c)(3) defines "use for a commercial, industrial, institutional, or governmental purpose" as follows:

> For purposes of this section, a lot or tract shall not be considered in use for a commercial, industrial, institutional, or governmental purpose if the lot or tract is used only temporarily, occasionally, or on an incidental or insubstantial basis in relation to the size and character of the lot or tract. For purposes of this section, acreage in use for commercial, industrial, institutional, or governmental purposes shall include acreage actually occupied by buildings or other man-made structures together with all areas that are reasonably necessary and appurtenant to such facilities for purposes of parking, storage, ingress and egress, utilities, buffering, and other ancillary services and facilities. . . .

Additionally, a municipality may annex an area that is not "developed for urban purposes" if the area meets the requirements set forth in N.C.G.S. § 160A-48(d) (2001), which provides in relevant part:

> In addition to areas developed for urban purposes, a governing board may include in the area to be annexed any area which does not meet the requirements of subsection (c) if such area . . .
>
>> (2) Is adjacent, on at least sixty percent (60%) of its external boundary, to any combination of the municipal boundary and the boundary of an area or areas developed for urban purposes as defined in subsection (c).

The purpose of this subsection is to permit municipal governing boards to extend corporate limits to include all nearby areas developed for urban purposes and where necessary to include areas which at the time of annexation are not yet developed for urban purposes but which constitute necessary land connections between the municipality and areas developed for urban purposes or between two or more areas developed for urban purposes. For purposes of this subsection, "necessary land connec-

tion" means an area that does not exceed twenty-five percent (25%) of the total area to be annexed.

An annexation ordinance may be challenged in superior court on the basis that the provisions of G.S. § 160A-48 have not been met. N.C.G.S. § 160A-50(f)(3) (2001).

> Judicial review of an annexation ordinance is limited to determining whether the annexation proceedings substantially comply with the requirements of the applicable annexation statute. Absolute and literal compliance with the statute is unnecessary because it would result in defeating the purpose of the statute in situations where no one has been or could be misled. Mere adverse effect upon financial interests of a property owner is not grounds for attacking annexation proceedings. The party challenging the ordinance has the burden of showing error.

*Barnhardt v. Kannapolis*, 116 N.C. App. 215, 217, 447 S.E.2d 471, 473 (1994) (internal citations omitted).

## IV.

**[1]** We turn first to whether the trial court erred in concluding that the City's annexation of Non-Urban Areas 1 and 4 met the requirements of G.S. § 160A-48(d)(2). CP&L contends that G.S. § 160A-48(d)(2) requires a non-urban area to touch the pre-annexation city limits of an annexing municipality. We disagree.

## A.

" 'Where the language of a statute is clear and unambiguous, there is no room for judicial construction[,] and the courts must give [the statute] its plain and definite meaning, and are without power to interpolate, or superimpose, provisions and limitations not contained therein.' " *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 575, 573 S.E.2d 118, 121 (2002) (quoting *State v. Camp*, 286 N.C. 148, 152, 209 S.E.2d 754, 756 (1974)). "[T]he intent of the legislature controls the interpretation of a statute. In seeking to discover this intent, the courts should consider the language of the statute, the spirit of the act, and what the act seeks to accomplish." *Stevenson v. Durham*, 281 N.C. 300, 303, 188 S.E.2d 281, 283 (1972). "[A] statute must be considered as a whole and construed, if possible, so that none of its provisions shall be rendered useless or redundant." *Porsh Builders, Inc. v. Winston-Salem*, 302 N.C. 550, 556, 276 S.E.2d 443, 447 (1981). "It is presumed that the legislature intended each portion [of a statute] to

be given full effect and did not intend any provision to be mere surplusage." *Id.*

G.S. § 160A-48(d)(2) provides that a non-urban area may be annexed if it is "adjacent, on at least sixty percent (60%) of its external boundary, to *any combination* of the municipal boundary *and* the boundary of an area or areas developed for urban purposes as defined in subsection (c)." (emphasis added).

CP&L properly notes that "[o]rdinarily, when the conjunctive 'and' connects words, phrases or clauses of a statutory sentence, they are to be considered jointly." *Lithium Corp.*, 261 N.C. at 535, 135 S.E.2d at 577. However G.S. § 160A-48(d)(2) does not use the word "and" alone; the statute also includes other words which bear on its meaning. *See Builders, Inc.*, 302 N.C. at 556, 276 S.E.2d at 447 (holding that statutes must be read so as to give effect to all statutory language).

Notably, the statute uses the word "combination," such that in order to be annexed, a non-urban area must touch a "*combination* of the municipal boundary *and* the boundary of an area or areas developed for urban purposes[.]" (emphasis added). "Combination" means "the act of combining or the state of being combined." AMERICAN HERITAGE COLLEGE DICTIONARY 277 (3d ed. 1997). Thus, in order to make the calculation required by G.S. § 160A-48(d)(2), the amount of border which the non-urban area shares with the municipality must be *combined with* the amount of border that the non-urban area shares with an area or areas developed for urban purposes.

Moreover, the statute explicitly makes allowance for "*any* combination[.]" (emphasis added). "Any" is defined as meaning "one, some, every or all without specification." AMERICAN HERITAGE COLLEGE DICTIONARY at 61. Accordingly, the plain language of the statute includes all possible combinations which make the following equation work: the amount of border which the non-urban area shares with the municipality *combined with* the amount of border that the non-urban area shares with an area or areas developed for urban purposes *equals* sixty percent of the border of the non-urban area. One workable combination exists where a non-urban area touches, on at least sixty percent of its external border, *only* an area or areas developed for urban purposes.

Examination of G.S. § 160A-48(b) illustrates that the General Assembly considered what areas must touch a municipal boundary and knew how to codify such a requirement:

The total area to be annexed must meet the following standards:

(1) It must be adjacent or contiguous to the municipality's boundaries at the time the annexation proceeding is begun. . . .

(2) At least one eighth of the aggregate external boundaries of the area must coincide with the municipal boundary. . . .

In light of the wording of subsection (b), the General Assembly's choice of words in subsection (d) was not accidental.

## B.

CP&L contends that permitting the City to annex non-adjacent non-urban areas is inconsistent with the purpose section of G.S. § 160A-48(d), which states:

The purpose of this subsection is to permit municipal governing boards to extend corporate limits . . . where necessary to include areas which at the time of annexation are not yet developed for urban purposes but which constitute necessary land connections . . . between two or more areas developed for urban purposes. For purposes of this subsection, "necessary land connection" means an area that does not exceed twenty-five percent (25%) of the total area to be annexed.

CP&L argues that the phrase "between two or more areas developed for urban purposes" requires that there be two separate areas developed for urban purposes, as defined in subsection (c)(3), between which the non-urban area must be located. We disagree.

In 1998 the General Assembly amended the unnumbered paragraph of subsection (d) to include the definition of "necessary land connection." Significantly, the Legislature chose to define "necessary land connection" to be a part of the total area to be annexed: "For purposes of this subsection, 'necessary land connection' means an area that does not exceed twenty-five percent (25%) of the total area to be annexed." G.S. § 160A-48(d). Thus, the statute seems to contemplate that necessary land connections will be sub-areas of a larger annexation area.

Likewise, at least one opinion predating the 1998 amendment held that land annexed under subsection (d) could permissibly be a "sub-area" of the entire area to be annexed. *See Southern Glove Mfg. Co. v. Newton*, 75 N.C. App. 574, 578, 331 S.E.2d 180, 183 ("[T]he sub-

area allowed by G.S. 160A-48(d)(2) is one of those described by the unnumbered paragraph as a 'necessary land connection.' "), *disc. review denied*, 314 N.C. 669, 336 S.E.2d 401 (1985); *see also Wallace v. Chapel Hill*, 93 N.C. App. 422, 430, 378 S.E.2d 225, 230 (1989) (non-urban property qualifies as a necessary land connection if such area meets the criteria set forth in (d)(1) or (d)(2)).

C.

CP&L also argues that permitting the City to annex non-adjacent non-urban areas is contrary to North Carolina appellate law. In support of its argument, CP&L cites numerous cases upholding annexation ordinances where undeveloped land abutted pre-annexation city limits: *In re Annexation Ordinance Adopted by the City of Jacksonville*, 255 N.C. 633, 643, 122 S.E.2d 690, 698 (1961); *The Little Red Schoolhouse, Ltd. v. Greensboro*, 71 N.C. App. 332, 338, 322 S.E.2d 195, 198 (1984); *Southern Glove Mfg.*, 75 N.C. App. at 578; 331 S.E.2d at 183; *Wallace*, 93 N.C. App. at 430, 378 S.E.2d at 230; *Chapel Hill Country Club, Inc. v. Chapel Hill*, 97 N.C. App. 171, 388 S.E.2d 168 (1990); and *Bali v. Kings Mountain*, 134 N.C. App. 277, 517 S.E.2d 208 (1999). However, none of these cases hold that a non-urban area must share a border with an annexing municipality.

CP&L also cites cases requiring a minimum level of urbanization for an entire annexation area; however, these cases do not preclude the annexation of the Long Shoals Area. In *Thrash v. Asheville*, 327 N.C. 251, 393 S.E.2d 842 (1990), the Supreme Court disallowed an annexation based on a recorded plat map showing that the land in question was subdivided because no evidence existed of any lots or streets on the actual property. The Court held that classifying such property as subdivided was inconsistent with the annexation statute, which requires "actual, minimum urbanization." *Id.* at 257, 393 S.E.2d at 846. In the case of *In re: Annexation Ordinance Adopted by the City of Charlotte*, 284 N.C. 442, 202 S.E.2d 143 (1974), the City of Charlotte divided an entire area to be annexed into "study" areas and applied population credits in each separate study area rather than to the area as a whole. Because doing so allowed Charlotte to annex areas that it otherwise could not, the Supreme Court held that the use of "study areas" was inconsistent with legislative intent. *Id.* at 457, 202 S.E.2d at 152. Both of these cases address the classification of areas as developed for urban purposes pursuant to G.S. § 160A-48(c), rather than the permissibility of including intervening undeveloped

lands pursuant to G.S. § 160A-48(d). They are, therefore, not controlling in the present appeal.

Where the Supreme Court has addressed the annexation of intervening undeveloped lands, its language has been consistent with an interpretation of G.S. § 160A-48(d)(2) which permits the annexation of non-urban areas completely enveloped by land developed for urban purposes:

> Cities with 5,000 or more people may annex an outlying urban area pursuant to G.S. 160A-48(c) and the *intervening undeveloped lands* pursuant to G.S. 160A-48(d) so long as the entire area meets the requirements of G.S. 160A-48(b).
>
> . . . .
>
> Thus, combining the holding in this case involving subsections (c) and (d) with the holding in *In re Annexation Ordinance . . .* involving subsection (c) the following principles emerge. The urban area that a city seeks to qualify for annexation under one of the urban purposes tests set forth in G.S. 160A-48(c)(1)-(3) must be considered as a whole; i.e., as one area and may not be divided into sub-areas or study areas. This requirement, however, does not preclude annexation of *intervening undeveloped land* pursuant to G.S. 160A-48(d). Finally, the entire area to be annexed must meet the requirements of G.S. 160A-48(b).

*In re: Annexation Ordinance Adopted by the City of Albemarle*, 300 N.C. 337, 341-42, 266 S.E.2d 661, 663-64 (1980) (emphasis added). In emphasizing that the annexed area be considered as a whole and sanctioning the annexation of "intervening undeveloped land," the Supreme Court seemingly contemplated the necessity of annexing non-urban land located between two or more pieces of land developed for urban purposes, even where the non-urban land does not actually touch the municipality. *Id.*

## D.

In the present case, the trial court affirmed the annexation of Non-Urban Areas 1 and 4, ruling that G.S. § 160A-48(d)(2) does not require the external boundaries of a non-urban area to be contiguous with the boundary of a municipality. We conclude that the trial court interpreted G.S. § 160A-48(d)(2) correctly. The assignments of error with respect to the classification of Non-Urban Areas 1 and 4 are, therefore, overruled.

V.

[2] We turn next to whether the City properly classified four tracts located within PIN 1056 as developed for industrial use. CP&L contends that the trial court erred in affirming the classification because the four tracts are not used "in support of" CP&L's power generating facilities. We do not agree.

G.S. § 160A-48(c)(3) prohibits an industrial classification where a "lot or tract is used only temporarily, occasionally, or on an incidental or insubstantial basis in relation to the size and character of the lot or tract." Subsection (c)(3) continues:

> [A]creage in use for . . . industrial . . . purposes shall include acreage actually occupied by buildings or other man-made structures together with all areas that are reasonably necessary and appurtenant to such facilities for purposes of parking, storage, ingress and egress, utilities, buffering, and other ancillary services and facilities. . . .

The Supreme Court has held that a town could not classify 13.747 acres as being in industrial use where the only development on the property was a 1.4 acre parking lot: "There is no evidence that the twelve acres of land in question were being used either directly or indirectly for industrial purposes. All of the evidence tends to show that it was not being *used* for any purpose." *Southern Ry. Co. v. Hook*, 261 N.C. 517, 520, 135 S.E.2d 562, 565 (1964).

This Court has distinguished *Hook* from a case where "the [disputed] sub-tracts . . . [were] contiguous to, and actually portions of, larger tracts used for commercial, industrial and institutional purposes." *Huyck Corp. v. Wake Forest*, 86 N.C. App. 13, 20, 356 S.E.2d 599, 604 (1987), *aff'd per curiam*, 321 N.C. 589-90, 364 S.E.2d 139-40 (1988). In *Huyck*, this Court held that relatively small pieces of property could be classified with a larger whole where there was competent evidence to suggest that "each tract, as identified by the tax maps and records, contain[ed] improvements used by the industry, business, or institution occupying the land so that each tract, as a whole, may [have been] said to be in use for the specified purpose." *Id.* at 21, 356 S.E.2d at 604.

In the present case, the City classified all of PIN 1056, including the four disputed tracts, as being in commercial use. At trial, CP&L offered the testimony of Luther Smith, an expert land planner; James Baldwin, a retired land management employee of CP&L; and Lloyd

Yates, vice-president for fossil generation at CP&L. Each witness testified on direct examination that the four disputed tracts were not used in support of the CP&L power generating plant.

However, on cross examination, the witnesses provided testimony that could support a finding that each tract was used in support of the power plant. Specifically, there was testimony that tracts 1 and 2 serve as a buffer for Lake Julian, and that tracts 3 and 4 serve as buffers for ash ponds located on the property. Moreover, testimony from all three witnesses indicated that Tract 3 is traversed by a roadway and a natural gas line, and that coal comes into the plant via rail cars at Tract 3.

CP&L bore the burden of proving at trial that the City's classification did not comply with the annexation statute. *Knight v. Wilmington,* 73 N.C. App. 254, 256, 326 S.E.2d 376, 378 (1985). While CP&L offered witnesses who disagreed with the classification of the four tracts, these same witnesses provided information on cross-examination which tended to support the City's classification. Accordingly, the trial judge made findings of fact which are supported by the evidence, though such evidence may have also supported contrary findings. We will not disturb a trial court's findings of fact where competent evidence exists to support them. *Food Town Stores, Inc.,* 300 N.C. at 25-26, 265 S.E.2d at 126; *Barnhardt,* 116 N.C. App. at 217, 447 S.E.2d at 473. The assignments of error with respect to the classification of the four disputed tracts within PIN 1056 are, therefore, overruled.

Affirmed.

Judge WYNN concurs.

Judge TYSON dissents.

TYSON, Judge dissenting.

I respectfully dissent from the majority's opinion.

## I. Issue

The issue before this Court is whether the trial court erred in concluding the City's annexation of Non-Urban Areas 1 and 4 met the requirements of N.C. Gen. Stat. § 160A-48(d)(2).

## II. N.C. Gen. Stat. § 160A-48(d)(2)

"The primary rule of statutory construction is that the intent of the legislature controls the interpretation of a statute." *Stevenson v. City of Durham,* 281 N.C. 300, 303, 188 S.E.2d 281, 283 (1972). "If the language used is clear and unambiguous, the Court does not engage in judicial construction but must apply the statute to give effect to the plain and definite meaning of the language." *Fowler v. Valencourt,* 334 N.C. 345, 348, 435 S.E.2d 530, 532 (1993). N.C. Gen. Stat. § 160A-48(d)(2) (2001) clearly and unambiguously requires that at least sixty percent of the "external boundary" of a non-urban area must adjoin at least two boundaries: (1) the "municipal boundary" and (2) the "boundary of an area or areas developed for urban purposes," in order to be annexed.

CP&L contends that the City's purported annexation of the Long Shoals Area fails to comply with the requirements of N.C. Gen. Stat. § 160A-48(d)(2) and asserts that neither Non-Urban Areas 1 nor 4 are "adjacent" or "connect" to the existing municipal boundary. The parties stipulated that neither external boundary of Non-Urban Areas 1 nor 4 touch Asheville's existing municipal boundary at any point.

N.C. Gen. Stat. § 160A-48(d)(2) (2001) states:

(d) In addition to areas developed for urban purposes, a governing board may include in the area to be annexed any area which does not meet the requirements of subsection (c) if such area . . . (2) Is adjacent, on at least sixty percent (60%) of its external boundary, to *any combination* of municipal boundary *and* the boundary of an area or areas developed for urban purposes as defined in subsection (c). The purpose of this subsection is to permit municipal governing boards to extend corporate limits to include all nearby areas developed for urban purposes and where necessary to include areas which at the time of annexation are not yet developed for urban purposes but which constitute *necessary land connections* between the municipality and areas developed for urban purposes or between two or more areas developed for urban purposes.

(emphasis supplied). The statute clearly requires that in order for a municipality to annex non-urban land, at least sixty percent of the external boundary of the land to be annexed must be adjacent to *any combination* of the municipal boundary *and* the boundary of an "area or areas developed for urban purposes," not either boundary standing alone. N.C. Gen. Stat. § 160A-48(d)(2) (2001).

Requiring annexed land to adjoin the existing municipal boundary promotes sequential and orderly growth. Otherwise, without non-urban areas serving as "necessary land connections," spot annexation of non-urban lands will be attempted that are far removed from the municipal's boundary. *Id.* Allowing isolated parcels to be annexed will frustrate the extension of municipal utility lines and will cause confusion. Governmental services, such as garbage removal, post office delivery, fire, police, and other emergency personnel must attempt to determine where jurisdiction of the municipal boundary to isolated annexed parcels begins and ends while responding to addresses. *See Hughes v. Town of Oak Island*, 158 N.C. App. 175, 580 S.E.2d 704, 708-09 (2003). The majority's interpretation allows municipalities to hopscotch over undeveloped non-urban areas and annex non-qualifying land areas solely for revenue enhancement. This interpretation is contrary to the plain language of the statute and case law, and does not promote orderly extension of municipal borders. The majority's interpretation also violates the policy that land which is urban should be municipal. Non-urban land which does not touch a city's boundary or which is not a "necessary land connection" from the municipal boundary to urban areas should remain non-municipal until that area meets the requirements of the statute.

The term "combination," as used in the statute, is defined as "something resulting from combining two or more things." *The American Heritage Dictionary*, 4th edition, (2000). "Combine" is defined as to "become united" or to "bring into a state of unity." *Id.* The plain meaning of the statute's language clearly requires that the non-urban area's boundary "unite" with the municipal boundary *and* the boundary of the urban area or areas. All of one thing and none of another is not "any combination." N.C. Gen. Stat. § 160A-48(d)(2) (2001). The majority's interpretation constitutes "violence to the legislative language." *Three Guys Real Estate v. Harnett County*, 345 N.C. 468, 473-74, 480 S.E.2d 681, 684 (1997).

The majority's opinion states that "[o]ne workable combination exists where a non-urban area touches, on at least sixty percent of its external border, *only* an area or areas developed for urban purposes." It holds that the requirements of N.C. Gen. Stat. § 160A-48(d)(2) are met, where a non-urban area's boundary does not adjoin the city limits at any point, but is adjacent on at least sixty percent of that area's external boundary to an urban area. I disagree. The majority's interpretation disregards the plain meaning of the term "combination" and the General Assembly's use of the conjunctive term "and." *See Grassy*

*Creek Neighborhood Alliance, Inc. v. City of Winston-Salem*, 142 N.C. App. 290, 542 S.E.2d 296 (2001) (quoting 73 Am. Jur. 2d, *Statutes* § 241 (1974)). If either prong alone would satisfy the statute, the General Assembly would have used the disjunctive term "or." *Id.* As the majority opinion states, "the General Assembly's choice of words in subsection (d) was not accidental."

Annexing a non-urban area whose external boundary adjoins sixty percent of an area developed for urban purposes and zero percent of the municipal boundary violates the plain language of the statute. "Any combination," as used in the statute, requires that at least sixty percent of the non-urban area's external boundary must be adjacent to a "combination" of the municipal's boundary *and* the urban area's boundary. As long as this "combination" of both prongs of the statute totals sixty percent, the statute's requirements are met.

### III.  Precedents

In *In re Annexation Ordinance*, the petitioners argued that the 15.5 acre undeveloped tract of land did not meet the requirements of N.C. Gen. Stat. § 160-453.16(b) and (c), now N.C. Gen. Stat. § 160A-48(b) and (c). 255 N.C. 633, 642-43, 122 S.E.2d 690, 698 (1961). Our Supreme Court disagreed and held that the 15.5 acre tract met the statutory requirements. *Id.* The Court further held that even if the land to be annexed did not meet the requirements of those statutes, it met the requirements of N.C. Gen. Stat. § 160-453.16(d), now N.C. Gen. Stat. § 160A-48(d)(2). *Id.* The Court interpreted the "any combination" language of N.C. Gen. Stat. § 160A-48(d)(2) and stated, "[a] casual examination of the annexation map shows that more than 60% of the external boundary of the 15.5 acre tract is adjacent to the city limits *and* the Forest Hills Development." *Id.* (emphasis supplied).

In *The Little Red School House, Ltd. v. City of Greensboro*, petitioners opposed annexation and argued that its subdivided land did not meet the requirements of N.C. Gen. Stat. § 160A-48(c) and N.C. Gen. Stat. § 160A-48(d). 71 N.C. App. 332, 337-38, 322 S.E.2d 195, 198 (1984). This Court held that subareas M-1 and M-3 were areas developed for urban purposes and met the requirements of N.C. Gen. Stat. § 160A-48(c). *Id.* at 338, 322 S.E.2d at 198. We further held that subarea M-2 was a non-urban area of land which did not meet the requirements of N.C. Gen. Stat. § 160A-48(c), but did meet the requirements of N.C. Gen. Stat. § 160A-48(d)(2). *Id.* We explained that even though subarea M-2 was not an "area developed for urban purposes,"

it met the requirements of N.C. Gen. Stat. § 160A-48(d)(2) "having 74.9% of its external boundary adjacent to the boundaries of the municipality *and* subareas M-1 and M-3." *Id.* (emphasis supplied).

In *Wallace v. Town of Chapel Hill,* petitioners argued that the town was without authority to annex the non-urban portion of their land for failure to meet the requirements of N.C. Gen Stat. § 160A-48(d)(2). 93 N.C. App. 422, 429, 378 S.E.2d 225, 229 (1989). This Court held that the non-urban land met the requirements of the statute and stated "[t]he Town presented evidence that the non-urban property met the criteria of (d)(2) in that the non-urban property was adjacent on at least sixty percent of its external boundary to a *combination* of the Town's boundary *and* the boundary of the area developed for urban purposes." *Id.* at 430, 378 S.E.2d at 230 (emphasis added).

This Court has also held proposed "shoestring" annexations by municipalities are invalid under North Carolina's annexation statutes. *Amick v. Town of Stallings,* 95 N.C. App. 64, 71, 382 S.E.2d 221, 225-26 (1989), *disc. rev. denied,* 326 N.C. 587, 391 S.E.2d 40 (1990). A "shoestring" annexation is when a municipality uses a narrow corridor to connect the municipality to an outlying, noncontiguous area it desires to annex. *Id.* This Court held that the use of "shoestring" corridors to connect a municipality to outlying, noncontiguous territory contravenes the contiguous boundary requirements set forth in the annexation statutes. *Id.* (quoting *Hawks v. Town of Valdese,* 299 N.C. 1, 12-13, 261 S.E.2d 90, 97 (1980)). We held that "such a 'crazy-quilt' boundary is not consistent with 'sound urban development' of a municipality 'capable of providing essential governmental services to residents within compact borders . . . .' " *Id.* (quoting *Hawks,* 299 N.C. at 12, 261 S.E.2d at 97).

N.C. Gen. Stat. § 160A-48(d)(2) was originally enacted in 1959 and has not been substantially changed since enactment. No case law supports the majority's interpretation of this statute. All prior cases clearly show that in order for a municipality to annex non-urban land, that land must adjoin sixty percent of its external boundary to "any combination" of the municipal boundary *and* the boundary of land developed for urban purposes. Either boundary standing alone is insufficient. Case law also holds "shoestring" annexations, where narrow corridors of land that touch the municipal's boundary are annexed and which are used for the sole purpose of complying with the statutory contiguity standards so that outlying, noncontiguous lands can be annexed are invalid. The majority's interpretation of the

statute allows municipalities to annex non-urban land without any physical, sequential, or urban nexus to the municipality. This interpretation is clearly contrary to the plain and unambiguous words used in the statute.

## IV. Conclusion

The City erroneously classified both areas as adjacent nonurban areas eligible to be annexed pursuant to N.C. Gen. Stat. § 160A-48(d)(2). It is stipulated that neither external boundary of Non-Urban Areas 1 nor 4 touch the City's existing municipal boundary at any point. The plain language of the statute and all prior case law is ·clear that at least sixty percent of non-urban area boundaries must adjoin *both* the existing municipal boundary *and* the boundary of an area or areas developed for urban purposes. I would hold that the trial court erred in concluding that the City's annexation of Non-Urban Areas 1 and 4 met the requirements of N.C. Gen. Stat. § 160A-48(d)(2). I respectfully dissent.